IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DUANE DAWSON, ) CIVIL 15-00537 LEK-KSC
)
    Plaintiff, )
)
  vs. )
)
NEAL WAGATSUMA, HARRY )
VICTORINO and JON MIYAJIMA, )
)
    Defendants. )
_____ )

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION ON
NON-JURY TRIAL HELD ON AUGUST 8, 2017; ORDER DENYING
PLAINTIFF'S MOTION FOR JUDGMENT IN PLAINTIFF'S FAVOR
AND DENYING DEFENDANT'S ORAL MOTION FOR JUDGMENT
AS A MATTER OF LAW; AND ORDER GRANTING
DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS**

       This case came on for a bench trial on August 8, 2017.

Plaintiff Duane F. Dawson ("Plaintiff" or "Dawson") appeared pro

se by telephone conference, and Defendants Harry Victorino and

John Miyajima, in their individual capacities ("Defendants"),

were represented by Kendall Moser, Esq. The Court, having

considered the pleadings, declarations and evidence admitted into

evidence, the testimony at trial, and the arguments of counsel,

makes the following Findings of Fact and Conclusions of Law and

Decision pursuant to Fed. R. Civ. P. 52. The Court rules that

Defendants are entitled to judgment on all of Plaintiff's claims.

Any finding of fact that should more properly be deemed a

conclusion of law and any conclusion of law that should more

properly be deemed a finding of fact shall be so construed.

In addition, Plaintiff's Motion for Judgment in Plaintiff's Favor ("Plaintiff's Motion"), [filed 8/4/17 (dkt. no. 69),] and Defendant's oral motion for judgment as a matter of law, pursuant to Rule 52(c) ("Oral Rule 52(c) Motion"), are denied; and Defendant's Motion for Judgment on Partial Findings ("Rule 52(c) Motion"), [filed 8/15/2017 (dkt. no. 72),] is granted.[1]

## BACKGROUND

Plaintiff filed his Prisoner Civil Rights Complaint ("Complaint") on December 28, 2015. [Dkt. no. 1.] Plaintiff asserts claims arising from alleged events while he was incarcerated at the Kauai Community Correctional Center ("KCCC") from July 25, 2015 through the filing of the Complaint. Plaintiff alleges the following claims under 42 U.S.C. § 1983: Defendant Harry Victorino, a Lieutenant at KCCC ("Victorino"), acting under the authority of Defendant Neal Wagatsuma, the Warden at KCCC ("Wagatsuma"), violated Plaintiff's constitutional right to freely practice his religion ("Count I"); Defendant Jon Miyajima, a Correctional Supervisor at KCCC ("Miyajima"), acting under Wagatsuma's authority, retaliated against Plaintiff for grieving the violation of his right to practice his religion

---

[1] The instant Decision and Order supersedes the Entering Order issued on February 6, 2018, which informed the parties of the Court's decision on the non-jury trial and its rulings on the pending motions. [Dkt. no. 76.]

("Count II"); and all of the defendants violated his constitutional right to equal treatment by denying him certain privileges because of his religion ("Count III").[2] Plaintiff named all of the defendants in their individual and official capacities. Plaintiff also sought injunctive relief.

This Court issued a Screening and Service Order on February 4, 2016 ("Screening Order"). [Dkt. no. 8.] The Screening Order allowed Plaintiff's claims against Victorino and Miyajima, in their individual capacities, to proceed. Plaintiff's claims against all of the defendants in their official capacities, Plaintiff's claims against Wagatsuma in his individual capacity, and Plaintiff's claim for injunctive relief were dismissed.

Defendants filed their Answer on May 20, 2016. [Dkt. no. 20.] Plaintiff did not file an amended complaint, and Defendants did not file any dispositive motions. Thus, the remaining portions of Counts I, II, and III proceeded to trial. Specifically, those claims allege:

_____

[2] The Complaint does not identify which of the defendants Plaintiff alleges Count III against. In light of Plaintiff's pro se status, Count III is liberally construed as alleging a claim against all of the named defendants. See, e.g., Eldridge v. Block, 832 F.2d 1132, 1137 (9th Cir. 1987) ("The Supreme Court has instructed the federal courts to liberally construe the 'inartful pleading' of pro se litigants." (citing Boag v. MacDougall, 454 U.S. 364, 365, 102 S. Ct. 700, 701, 70 L.Ed. 2d 551 (1982) (per curiam))).

Count I – Victorino "willfully, sadistically & maliciously denied
    Plaintiff's free exercise to religion by forcing Plaintiff
    to denounce his Native Hawaiian Religious Practice to
    participate in the uncertified Module Contract Program a
    christian [sic] based program"; [Complaint at pg. 5;]

Count II – Miyajima "spiteful [sic] and malevolently retaliated
    against Plaintiff for filing grievances based on the unfair
    treatment received in regards to the denied opportunity to
    participate in the Module Contract Program";[3] [id. at
    pg. 6;] and

Count III – Plaintiff "has been deliberately denied equal
    treatment to regularly" in certain privileges "like other
    selected individuals" in the Module Contract Program, which
    Plaintiff alleges he cannot participate in as a practitioner
    of the Native Hawaiian Religion, [id. at pg. 7].

At trial, Plaintiff testified in support of his case.

He did not present any other witnesses.  After Plaintiff rested

his case, Defendants' counsel made the Oral Rule 52(c) Motion,

which was taken under advisement.  [Trans. of 8/8/17 Trial

("Trial Trans."), filed 8/15/17 (dkt. no. 71), at 47-48.]

Defendants presented the Declaration of Harry Victorino

("Victorino Declaration") and the Declaration of Jon Miyajima

("Miyajima Declaration") in lieu of direct testimony.  Defendants

also gave live testimony at trial.  In addition, Exhibits D1

through D12 were received into evidence.  [Id. at 64, 107.]

After Defendants rested their case, they orally renewed their

motion for judgment as a matter of law.  The renewed oral motion

was taken under advisement, and Defendants were directed to file

_____

[3] The alleged retaliation included being placed in
segregation at KCCC and being transferred to Halawa Correctional
Facility ("Halawa" or "HCF").  [Complaint at pg. 6.]

4

a written motion.  [Id. at 107-09.]  Defendants did so, and the
Rule 52(c) Motion supersedes their renewed oral motion.

Plaintiff filed his written closing argument on
August 31, 2017.  [Dkt. no. 74.]  Defendants filed their Closing
Argument Brief on September 5, 2017.  [Dkt. no. 75.]

## FINDINGS OF FACT

The Court makes the following findings of fact based on
the declarations, trial testimony, and exhibits submitted by the
parties.

1.    Plaintiff has been incarcerated by the State of Hawai`i
("the State") at KCCC and other facilities since the mid-1990s.
[Miyajima Decl. at ¶ 8.]

2.    During the period at issue in the Complaint (July 25,
2015 to December 28, 2015), both Defendants were employed at
KCCC.  Miyjima was a Corrections Supervisor I, and Victorino was
an Adult Corrections Officer ("ACO") V (Lieutenant).  [Id. at
¶¶ 4-5; Victorino Decl. at ¶ 4.]

3.    Victorino began working at KCCC on February 3, 1997 and
was still working there at the time of trial.  [Victorino Decl.
at ¶¶ 3-4.]  Miyajima began working at KCCC in April 1997 and
continued working there until his retirement on December 31,
2015.  [Miyajima Decl. at ¶¶ 3-4.]

4.    Miyajima's duties and responsibilities as a Corrections
Supervisor I included: "ensuring that inmates are classified

correctly; being responsible for the movement of inmates between State of Hawaii correctional facilities; . . . and serving as the Inmate Grievance Officer at KCCC." [Id. at ¶ 6.]

## A.    **The Module Contract Program**

5.    KCCC has a Module Contract Program ("Module Program" or "Program"), which has been in place since the 1990s. [Victorino Decl. at ¶ 14.] The State Department of Public Safety ("DPS") uses the Module Program as a rehabilitation tool. The Module Program "is part of a plan to provide an environment that helps inmates successfully re-enter the community through a sequential phasing process." [Id. at ¶ 15.]

6.    Victorino's testimony on these matters is supported by Exhibit D-10, titled "Module B – Changing Direction" and dated October 1998 ("Module Program 1998 Manual"). See Module Program 1998 Manual at Chap. 1, § C.[4]

7.    Every KCCC inmate who enters the modules has the opportunity to participate in the Module Program. [Exh. D-9 (Module Program Packet – Time to Change Direction!, dated 6/16/15 (Revised) ("Module Program Packet")) at 5.[5]]

8.    The Module Program has a Pre-phase level and subsequent levels for Phase 1, 2, and 3. [Id.] Inmates who wish to enter

---

[4] The Module Program 1998 Manual does not have page numbers.

[5] The Module Program Packet appears to have superseded the Module Program 1998 Manual, which was created when the Module Program was only conducted in Module B.

the Module Program must submit a written request, and it must be approved. When an inmate is admitted into the Module Program, he or she enters as a Pre-phase/Phase 1 resident. [Victorino Decl. at ¶ 14.]

9. The inmates at the Pre-phase and Phase 1 level have no additional privileges, and the inmates in the Phase 3 level have the "maximum amount of privileges allowed while in the module." [Module Program Packet at 5.] For example, Phase 2 and Phase 3 inmates are allowed to utilize the dayroom areas. Inmates who achieve Phase 3 may also be considered for the Lifetime Stand ("LTS") Program, if they have an appropriate security classification. [Id.] The LTS Program is conducted outside of the modules. [Trial Trans. at 59.]

10. Other testimony was presented regarding the LTS Program, but it is not addressed in the Findings of Fact because it is not relevant to Plaintiff's claims at trial.

11. Module Program participants "who refuse to follow Program guidelines and facility rules, will be housed in pre phase rooms, and will only be allowed out of their rooms for meals, recreation, showers, and designated out of cell times." [Module Program Packet at 5.] Further, "[i]f these inmates and/or their actions/conduct become detrimental to the module program and/or facility guidelines," they may be subjected to disciplinary action. [Id.]

12.  As of July 21, 2015, Plaintiff had been in the Module Program Pre-phase room for Module B for approximately ten days and had been engaging in "Program recreation, popcorn or cook out nights, videos, etc." [Victorino Decl. at ¶ 16.]  On two other occassions, Plaintiff participated in the Module Program while he was housed in Module A, but Plaintiff removed himself from the Program because he did not want to comply with the applicable rules.  [Id. at ¶ 18.]

### Plaintiff's Testimony

13.  Plaintiff testified that, on July 21, Victorino spoke with inmate Joe Ibana ("Ibana"), and Ibana informed Victorino that Plaintiff was not reading the Bible.  Plaintiff testified that, for "a couple days" prior to July 21, he had been stepping out of the room when the Program participants started their Bible studies.  [Trial Trans. at 21.]  According to Plaintiff, after Ibana informed Victorino Plaintiff was not reading the Bible, Victorino shut down the Pre-phase program.  [Id.]  Further, after the Pre-phase program was closed, all of the other Pre-phase participants were eventually allowed into the Module Program, except for Plaintiff.  [Id. at 36.]

14.  Plaintiff has asserted Victorino is the Program Administrator of the Module Program.  [Complaint at pg. 5.] Plaintiff also asserted at trial that the Module Program is

"considered Lieutenant Victorino's program," but Victorino denied this. [Trial Trans. at 83.]

15. Plaintiff testified the Module Program is a Christian-based program that requires daily Christian activities, including Bible study, prayer to Jesus, and watching Christian-based television programs. Plaintiff asserts that, because he is a practitioner of the Native Hawaiian Religion, he was not able to join or participate in the Program.[6] [Id. at 22, 25.] Plaintiff testified that, to the present day, he cannot gain admission into the Module Program unless he reads the Bible. [Id. at 30.]

16. According to Plaintiff, inmates of other religions, including Buddhists, are not granted admission into the Module Program. [Id.]

17. According to Plaintiff, Victorino said Plaintiff's participation in the Module Program was required for Plaintiff to be able to attend his father's funeral. [Id. at 21.] Plaintiff did not want to be in the Module Program because it was Christian-based, but he participated so that he could attend his father's funeral. He had not attempted to participate in the Module Program for years prior to his July 2015 participation in the Program. [Id. at 27-28.]

---

[6] According to Plaintiff, the Pre-phase program is not part of the Module Program; it is merely a required step to gain admission into the Program. Plaintiff asserts he was never admitted into the Module Program program. [Trial Trans. at 24-25.]

18.  Plaintiff was not able to attend his father's funeral, which took place two days after Plaintiff was transferred to Halawa.  [Id. at 32-33.]

19.  At trial, Plaintiff did not present any witnesses or exhibits supporting his position that the Module Program is a Christian-based program or that he was required to denounce his Native Hawaiian Religion as a condition of his pariticipation in the Program.  Plaintiff's position relies solely on his testimony that participation in Christian activities was a requirement of the Module Program.

20.  Plaintiff testified that only inmates in the Module Program get "weekend recreation," while inmates who are not in the Program "are only allowed fresh air rec."  [Id. at 38.]  He asserts this is supported by the Log Book, i.e. Exhibit D-12.  [Id.]

21.  Plaintiff testified that inmates in the Module Program are allowed to play basketball, lift weights, and have occasional cookouts.  They are also allowed items that non-Program inmates do not have access to, including radios, chairs, DVDs, water jugs, and additional food, as well as certain types of food that non-Program inmates cannot have.  Further, they are allowed access to areas that non-Program inmates are not allowed to enter.  [Id. at 39-40.]

22.  Plaintiff testified about other issues related to the
Program, including that: the Module Program improperly co-mingled
pre-trial inmates and inmates who were already serving a
sentence; KCCC improperly allows Module Program inmates to
supervise inmates who are not in the Program; and the Module
Program jeopardizes the security of the facility.  Those portions
of Plaintiff's testimony are not discussed in these Findings of
Fact because they are not relevant to Plaintiffs' claims at
trial.

### Defendants' Testimony and Evidence

23.  According to Victorino, he "had very little involvement
with the Module Contract Program" in 2015 because he was
conducting multiple, concurrent, facility investigations.
[Victorino Decl. at ¶ 17.]

24.  In his capacity as the Chief of Security liaison,
Victorino provides oversight for the Module Program and
facilitates its operation.  He does not have the authority to
grant or take away privileges from Program inmates (or from non-
Program inmates), although he can make recommendations.  Further,
Victorino does not make policy.  [Id. at ¶ 19.]

25.  Although participation in most Module Program
activities is desired, all that is required for acceptance and
continuation in the Program "is for an inmate to display a
willingness to make a positive change, go through the selection

process, and progressively work towards redirection." [Id. at ¶ 20.] Victorino also testified inmates may opt out of activities offered within the Module Program. [Id.]

26. According to Victorino, inmates in the Module Program "are allowed to practice, or not, whatever faith they choose." [Id.]

27. Victorino testified that, on July 21, 2015, Module Program Sergeant Mark Fujiuchi ("Fujiuchi") closed the Module B Module Program Pre-phase room (B6) because the inmates were non-compliant. [Id. at ¶ 16.] Victorino agreed with the closing of the Pre-phase room, but it was Fujiuchi who made the decision. Because of the closure of the Pre-phase room, Plaintiff and the other inmates in the Pre-phase room were removed from the Module Program. As a result, Plaintiff was assigned back to regular housing. The room closure and Plaintiff's reassignment were "due to the inmates' non-compliance [and] had nothing to do with religion." [Id. at ¶ 18.]

28. Victorino's testimony on these issues is supported by: Exhibit D-6, a Module Program Memorandum, dated July 21, 2015 to Chief of Security ("COS") Lewis Lindsey ("Lindsey"), Wagatsuma, and others, from Fujiuchi, the ACO-IV Module Compliance Sergeant ("7/21/15 Memo"); and Exhibit D-7, a Supplemental Incident Report, dated July 21, 2015, to Lindsey and Wagatsuma, from

Fujiuchi regarding an incident that occurred after the closing of the Module B Pre-phase room ("7/21/15 Incident Report").

29. The 7/21/15 Memo states, as of that date, "the Module Program Pre-phase has been shut down until further notice. Module B-Bedroom 6 is regular housing." [Exh. D-6.]

30. The 7/21/15 Incident Report's synopsis states Plaintiff "stopped operations by threatening to flood Module B-Bedroom 6 and disrupted facility operations for 1 hour." [Exh. D-7.] However, the report does not describe the flooding threat. The report states:

> Inmate DAWSON, D. was upset because the Pre-program room in Module B was shut down. DAWSON, D. stated that he was really trying and that he didn't understand why they got shutdown. He was venting because according to the Warden if he was a participant in the Module Program he would have been approved to go his father's funeral. . . . He (DAWSON) was exhibiting the poor behavior that got that room shutdown. His actions just reinforced the closing of the room. They were ultimately closed down due to non-compliance to Program rules and for having negative behaviors.

[Id. (emphases in original).]

31. Plaintiff was allowed to "rant and rave for an hour about how wrong he was being treated." [Id.] During, this time, Plaintiff "referenced going to the 'Hole' and Halawa." [Id.] Fujiuchi ultimately determined Plaintiff did not pose an immediate threat and order Plaintiff be returned to Bedroom 6.

However, the 7/21/15 Incident Report notes Plaintiff hampered the headcount and delayed operations by at least an hour. [Id.]

32. According to Victorino, the first time he learned Plaintiff was a practitioner of the Native Hawaiian Religion was through the Complaint. [Victorino Decl. at ¶ 12.] Plaintiff never told Victorino or anyone else: Plaintiff was a practitioner of the Native Hawaiian Religion; he believed he was unable to participate in the Module Program because it was Christian-based; or he required an accommodation to allow him to practice the Native Hawaiian Religion. [Id. at ¶ 16.]

33. If Plaintiff had done so, KCCC "Facility Chaplain Clayton Sui would have met with [Plaintiff] one-on-one to better understand what he required in order to practice his religion, before then making a request and/or recommendation to the Facility Administrator and the Department head for such accommodations." [Id.] This never happened because Plaintiff did not inform anyone of a concern about the practice of his religion within the Module Program. [Id.] In fact, according to Victorino, Plaintiff "has voiced concerns about many things in the past, but never about religion." [Id. at ¶ 16.]

34. Victorino testified that he: "did not force Dawson to renounce his Native Hawaiian religion"; "did not deny Dawson's right to exercise his religion"; and "did not willfully,

sadistically, or maliciously violate Dawson's constitutional rights." [Id. at ¶¶ 9-11.]

35. Defendants also submitted a memorandum dated September 30, 2008 to Security Staff & Module Program Inmates from Victorino and Sergeant James Kilmer ("Kilmer" and "9/30/08 Memo"), stating: "Program male inmates have requested an opportunity to conduct a joint bible study for all program male **inmates who desire to voluntarily participate**." (Emphasis added.) The 9/30/08 Memo specified one-hour blocks on Tuesdays and Saturdays when the study could be held, and well as on Sundays, if Victorino and/or Kilmer were available. The 9/30/08 Memo also specified the rooms that could be used for the study, and identified the inmate who would lead the study along with others who were not identified by name.

36. The Module Program Packet does not discuss Christianity, the Bible, religion, or other related topics, except for one statement in the Weekly Program Reminders section that "LDS CHURCH/BIN CHECK" is on Mondays.[7] [Module Program Packet at 25 (emphasis in original).]

37. The prior Module Program 1998 Manual contains one reference to "church": "As a resident of Module B you are expected to behave outside of Module "B" as well as inside the

---

[7] "LDS Church" likely refers to the Church of Jesus Christ of Latter-day Saints. The record does not indicate what the "LDS CHURCH/BIN CHECK" is.

Module (Visiting Room and Church)."  [Module Program 1998 Manual at Chap. 5, § B (Module B House Rules), ¶ 29 (emphasis omitted).] It also specifies that the following prayer is given at headcount during meals:

> God is good
> God is great
> Thank you Lord for this food
> Amen.

[<u>Id.</u> at Chap. 5, § C-5 (Procedures for Headcount), ¶ 2.E. (emphasis omitted).]  Other than these, the Module Program 1998 Manual does contain any references to Christianity, the Bible, religion, or related topics.

38.   The Module Program 1998 Manual was not in effect at the time Plaintiff alleges he was removed from the Module Program for not reading the Bible.

**B.    <u>Alleged Retaliation</u>**

**<u>Plaintiff's Testimony</u>**

39.   Plaintiff testified he was placed in segregation, *i.e.* "the hole," because he filed grievances, and this has been going on "for years."  [Trial Trans. at 34.]

40.   According to Plaintiff, the stated reasons for placing him in segregation – including, inciting riots, threatening ACOs, destroying a door, trying to escape, making up lies about being raped – were all fabricated.  [<u>Id.</u> at 34-35.]

41.   According to Plaintiff, "[w]hen they throw in me [sic] in the hole . . . they turn my water off.  I literally got to

taste my own feces and urine every time I take a bite out of my food. They literally torturing me because I file grievances." [Id. at 23.]

42. Plaintiff did not testify regarding any specific incidents during the period in question when he was allegedly placed in segregation in retaliation for filing grievances. However, Defendants submitted an Incident Report stating Plaintiff was placed in segregation following an incident on August 2, 2015. See discussion of Exh. D-8, infra.

43. Plaintiff testified he was transferred to Halawa based "on lies saying that [he] destroyed a $2500 door," but "[t]he same door is still in its place." [Trial Trans. at 23.]

44. The transfer was also based on the fact that Plaintiff had eighteen points. Plaintiff asserted that this score was unfounded, and he emphasized he never tried to escape. [Id.] Plaintiff believes he was sent to Halawa for writing grievances because he allegedly had eighteen points, and fifteen points or more is considered maximum custody. When he was sent to Halawa, he had ten points for his pending charges, two points for prior felonies, and one point for his age, for a total of thirteen points at the time of transfer. [Id. at 67.] To the extent Plaintiff was assigned points because of the alleged escape incident, his position is that the points should not have been

added until he had the opportunity to complete the grievance process to challenge his write-up for the incident. [Id. at 65.]

45. Plaintiff testified, "they said I asked to go to Halawa or I asked to be put in a hole," but he denies making such requests. [Id. at 23.]

46. Plaintiff states the KCCC Log Book entries for August 2, 2015 do not indicate inmates were moved out of his Module B room because of damage to the door. [Id. at 88.] One of the August 2, 2015 entries states, "FYI 1730 – Inmate DAWSON kicking the door in bedroom 6," and the next entry notes "2145 – last check, all appear normal." [Exh. D-12 (KCCC Log Book), vol. 5 at 3503-04.]

47. Victorino acknowledged the movement of ten inmates because of damage to the door should have been logged. [Trial Trans. at 88.]

48. Plaintiff has not presented any evidence of, or testimony describing, grievances he submitted prior to his transfer to Halawa alleging the Module Program was discriminatory because it was a Christian program. Plaintiff elicited testimony from Miyajima about the denial of Plaintiff's grievance regarding weekend recreation. [Id. at 54-55.] However, there was no evidence this grievance raised the issue of religious discrimination in the Module Program.

49. Plaintiff also testified about general complaints regarding KCCC's inmate grievance process, including: that, outside of the period at issue in this case, some of the grievances he submitted were not filed; that some of his grievances were not handled by the appropriate DPS personnel; and how difficult it is to complete all levels of the grievance process. This testimony is not addressed in these Findings of Fact because it is not relevant to Plaintiff's claims at trial.

## Defendants' Testimony and Evidence

50. Plaintiff was moved to Halawa, effective August 6, 2015. He was moved back to KCCC effective November 3, 2015. [Exh. C-5 (Drill Down Detail Report regarding Plaintiff, dated 7/26/17) at 3.[8]]

51. Miyajima signed an Inmate Transfer Request, dated August 5, 2015, recommending Plaintiff be transferred from KCCC to Halawa ("Transfer Request"). The Transfer Request was approved on the same date, as evidenced by a signature that appears to be Wagatsuma's. The Transfer Request states Plaintiff is at the maximum custody level and has a total of eighteen points. [Exh. D-4.] Miyajima confirmed he prepared the Transfer

---

[8] The Drill Down Detail Report lists all of Plaintiff's activity within the DPS system from September 18, 1995 to July 19, 2017, including booking, release, housing allocation, movement within a facility, and movement to a different facility.

Request and that Plaintiff requested the transfer. [Miyajima Decl. at ¶ 14.]

52. The Transfer Request states the reason for the request is:

> Pre-Trial Felon, 5th Circuit commitment. Pending trial, 11/02/15 for CR. No. 15-1-0206 (UEMV) and 15-1-0223 (Att MUR 1, Att MUR 2x3, TT1 x3) Inmate broke the door to his bedroom on 08/02/15, requiring 10 inmates to be moved to other cells as the bedroom could not be secured. Since 07/18/06, 14 misconducts, 4 greatest, 3 high level. Inmate requests transfer to HCF.

[Exh. D-4 (emphases in original).]

53. Victorino testified this transfer to Halawa was because of Plaintiff's misconduct, and it was unrelated to his participation the Module Program. [Victorino Decl. at ¶ 21.]

54. Miyajima testified Plaintiff's "classification changed to maximum custody because he kicked and broke a door at KCCC which had to be replaced." [Miyajima Decl. at ¶ 10.]

55. Defendants presented an Incident Report, dated August 2, 2015, addressed to Lindsey and Wagatsuma, from Fujiuchi ("8/2/15 Incident Report"). The synopsis of the report states Plaintiff was "placed in segregation after acting out in Module B, and damaging bedroom 6 door." [Exh. D-8.]

56. According to the 8/2/15 Incident Report, Plaintiff told KCCC staff "you guys better turn off the water or you guys are in for a long night." [Id.] While Fujiuchi was turning off the water, Plaintiff "repeatedly kicked and slammed" the door of

Module B's Holding Cell 3. [Id.] Fujiuchi later confronted Plaintiff about escalating the situation, and Plaintiff responded, "'Yeah I probably going end up kicking this door!'" [Id.]

57. KCCC considered the act of damaging the door an act of attempted escape. See, e.g., Trial Trans. at 37.

58. Miyajima testified that, based on his years of experience classifying inmates, Plaintiff was correctly classified as a maximum custody inmate because of his misconduct at KCCC and the charges pending against him. Following the incident involving the door, Plaintiff's points increased such that he was considered a maximum custody inmate. According to Miyajima, Plaintiff was transferred to Halawa in August 2015 because KCCC does not house maximum security inmates, and Halawa is a more secure facility. [Miyajima Decl. at ¶ 13.]

59. Miyajima testified that: Plaintiff "was not transferred to Halawa because submitted grievances about the Module Program at KCCC"; and "he did not retaliate against Dawson because he submitted grievances about the Module Program." [Id. at ¶¶ 15-16.] Miyajima did not testify as to the issue of whether Plaintiff submitted grievances about the Module Program prior to his August 2015 transfer to Halawa.

60. On August 18, 2015, while Plaintiff was at Halawa, he submitted a grievance alleging: "I am discriminated against for

21

being a Native Hawaiian Practitioner. That is my religion. LT. Victorino made up lies to have me shipped out for Management Problem for speaking up against his 'Special Agenda' Christian based program that subjects anybody not in it to cruel and unusual punishment." [Exh. D-2 (Administrative Remedy Form ("8/18/15 Grievance")).] The form noted Plaintiff attempted to resolve the issue on August 17, 2015 through informal discussion with Herb Almeida. [Id.]

61. On August 27, 2015, Wagatsuma responded: "You were transferred to HCF having earned your maximum custody because of your misconducts and nonstop disruptions. It has nothing to do with your stated claims, including discrimination. Grievance denied." [Id.]

62. On September 12, 2015, Plaintiff took the 8/18/15 Grievance to a step III appeal by submitting another Administrative Remedy Form disagreeing with Wagatsuma's response ("9/12/15 Appeal"). [Exh. D-3.] It stated:

> The first week that I was incarcerated in KCCC I was max custody without even being written up. They told me because the seriousness of my charges, yet they housed me in general POP. I was provoked by LT. Victorino and his "special agenda" Christian based Program until I finally flew off the hook. I am registered as a Native Hawaiian Practitioner. Because I don't read the bible or Pray to Jesus Christ I am not afforded certain commodities as other sentenced and Pre-trail [sic] inmates in KCCC. That is discrimination.

[Id.]

22

63. On October 12, 2015, Acting Institution Division Administrator Shari Kimoto responded: "The reasons for your transfer as maximum custody to HCF was [sic] previously addressed in [the 8/18/15 Grievance]. You were transferred to HCF as a maximum custody inmate due to your pending murder charge and greatest category misconduct 6(7); not due to your religious preferences. Your grievance is denied." [Id.]

## C. **Court's Findings**

Having considered all of the evidence before it, the Court finds as follows:

64. This Court finds some portions of Plaintiff's testimony are credible, but other portions are not.

65. As of July 21, 2015, Plaintiff was a participant in the Module Program at the Pre-phase level.

66. Plaintiff was participating in the Module Program because either Wagatsuma or Victorino told him participation in the Program was required in order for him to attend his father's funeral. It is not necessary to resolve the factual issues of who told Plaintiff this and whether Victorino had the authority to grant Plaintiff's request to attend the funeral.

67. Plaintiff's testimony that the Module Program is a Christian-based program requiring, *inter alia,* daily Bible study and prayer to Jesus is not credible.

68.   Victorino gave credible testimony that: inmates in the Module Program are allowed to practice whatever religion they choose, including being allowed to practice no religion; inmates may opt out of Program activities; Plaintiff never complained about discrimination in the Module Program based on Plaintiff's practice of the Native Hawaiian Religion; and, if Plaintiff had made such a complaint, the KCCC chaplain would have met with Plaintiff regarding possible accommodations.

69.   There are some activities offered in the Module Program that are connected to religion – *i.e.*, inmate led Bible study two or three times a week and the "LDS CHURCH/BIN CHECK" – and there is evidence of more extensive religious activities in the Module Program 1998 Manual.  However, the Module Program 1998 Manual was not in effect during the period at issue in this case, and there is no credible evidence that the religious activities included in the Module Program during the period in question were mandatory, nor is there any evidence that religious activities were a central component of the Module Program during the period in question.

70.   The Module Program is not a religious program.

71.   While he was participating in the Module Program, Plaintiff did not make it known that he believed he was unable to participate in certain Program activities because he is a practitioner of the Native Hawaiian Religion.  If he had done so,

the KCCC chaplain would have worked with him to request any accommodation, if an accommodation was necessary.

72. Plaintiff's testimony that the Module B Pre-phase room was closed, which caused him to be removed from the Module Program, because he refused to read the Bible is not credible.

73. Fujiuchi closed the Module B Pre-phase room because the Program participants in that room – *i.e.* including, but not limited to, Plaintiff – were not complying with the requirements of the Program.

74. Plaintiff's removal from the Module Program was not based on his refusal to participate in Christian activities or on his practice of the Native Hawaiian Religion.

75. There is no credible evidence Plaintiff's participation in the Module Program required him to renounce the Native Hawaiian Religion, nor is there any evidence Plaintiff's practice of the Native Hawaiian Religion was prohibited or impaired while he was in the Module Program.

76. Plaintiff filed a grievance alleging the Module Program was a Christian-based program, but he did not file the grievance until after he was transferred to Halawa.

77. Plaintiff's testimony that he filed similar grievances prior to his transfer is not credible.

78. After the closure of the Module B Pre-phase room, Plaintiff was placed in segregation and was later transferred to

Halawa, but his testimony that these decisions were in retaliation for the filing of grievances about the Module Program is not credible.

79. Defendants gave credible testimony that: Plaintiff's custody classification changed because of misconduct regarding the bedroom door; and Plaintiff's transfer to Halawa was not related to either the Module Program or the filing of grievances about the Module Program.

80. Based on the 8/2/15 Incident Report, this Court finds Plaintiff was placed in segregation because of misconduct regarding the bedroom door.

81. Plaintiff testimony that he did not break the bedroom door is not credible. Although there is no notation in the Module B Log Book about ten inmates being moved because of the broken door, and Victorino testified that the movement of ten inmates should have been logged, that is not sufficient to prove Plaintiff was placed in segregation and transferred to Halawa in retaliation for filing grievances about the Module Program.

82. Plaintiff was placed in segregation and transferred to Halawa for reasons that were unrelated to either his participation in the Module Program or any grievance he submitted about the Module Program being a religious program.

83. KCCC inmates who participate in the Module Program have many more privileges and opportunities than inmates who do not.

However, because the Module Program is not a religious program, non-Program inmates are not denied privileges and opportunities based on religion.

## CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).

### B. Defendants' Oral Rule 52(c) Motion

2. Defendants made their Oral Rule 52(c) Motion at the close of Plaintiff's case. Judgment could not be granted in favor of Defendants at that time because Plaintiff's testimony, if found to be credible, would have established his claims. His testimony therefore had to be viewed in the light of all of the evidence as a whole, and Defendants were required to present their case.

### C. Plaintiff's § 1983 Claims

3. "To prevail on a Section 1983 claim, a plaintiff must establish that a right secured by the Constitution or law of the United States was violated and that the violation was committed by a person acting under the color of state law." Johnson v. Dep't of Pub. Safety, CIV. No. 16-00348 HG-KSC, 2017 WL 2524846, at *3 (D. Hawai`i June 9, 2017) (citing West v. Atkins, 487 U.S. 42, 48 (1988)). "A person deprives another of a constitutional

right, within the meaning of Section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which the plaintiff complains." Id. (citing Leer v. Murphy, 844 F.2d 628, 633 (9th Cir. 1988)).

4.   At all times relevant to this case, Miyajima and Victorino were persons acting under the color of Hawai`i law for purposes of § 1983 because the actions at issue occurred in their capacities as KCCC employees. See West, 487 U.S. at 49 ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." (citation and internal quotation marks omitted)).

**Count I – Compelled Participation in the Module Program**

5.   The First Amendment states, *inter alia*: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  This provision is made applicable to the State of Hawai`i through the Fourteenth Amendment.  See Stone v. Graham, 449 U.S. 39, 40 n.2 (1980).

6.   Coercing a prisoner to participate in a religious program that would require him "to renounce his own religious belief [] offends the core of Establishment Clause

jurisprudence." <u>Inouye v. Kemna</u>, 504 F.3d 705, 713 (9th Cir. 2007).[9]

a. The plaintiff in <u>Inouye</u> alleged his parole officer vioalted the Establishment Clause by requiring him to attend Alcoholics Anonymous/Narcotics Anonymous ("AA/NA") meetings as a condition of his parole. Inouye was a Buddhist and had a well-established history – both during his incarceration and in connection with his parole – of objecting to being compelled to participate in drug treatment programs that were based in religion. One of his parole conditions was to attend a drug addition treatment program that required participation in AA/NA meetings. Inouye eventually refused to participate in the program and was terminated from it. Due in part to his refusal to participate in the mandatory drug treatment program, Inouye was arrested for parole violations and his parole was revoked. The district court granted summary judgment in favor of the parole officer, and Inouye appealed. <u>Id.</u> at 709-10.

b. The parties "agree[d] that reverence for 'a higher power' is a substantial component of the AA/NA program." <u>Id.</u> at 712. As part of the qualified immunity analysis, the Ninth Circuit held the parole officer's requirement that Inouye attend

---

[9] Although Plaintiff has referred to Count I as alleging the violation of his right to freely practice his religion, Count I is liberally construed as alleging a violation of both the Establishment Clause and the Free Exercise Clause.

AA/NA meetings violated Inouye's rights under the Establishment Clause and reversed the grant of summary judgment in favor of the parole officer. Id. at 714, 717.

c. In its qualified immunity analysis, the Ninth Circuit adopted the following analysis to determine whether there was improper government coercion of religious activity: "first, has the state acted; second, does the action amount to coercion; and third, is the object of the coercion religious rather than secular?" Id. at 713 (citation and quotation marks omitted).

7. The first two prongs of the Inouye analysis are met in this case because KCCC personnel told Plaintiff he had to participate in the Module Program if he wanted to attend his father's funeral, and that amounts to coercion.

8. The third prong is not met because the Module Program is not a religious program. Plaintiff has therefore failed to prove his rights under the Establishment Clause of the First Amendment were violated.

9. Even if this Court concluded that it was a violation of Plaintiff's First Amendment rights under the Establishment Clause to compel him to participate in a program that had a primarily secular purpose but had limited, optional, religious components, this Court would conclude that Victorino is entitled to qualified immunity.

a.   The Ninth Circuit stated:

Government officials who perform discretionary functions generally are entitled to qualified immunity from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  The Supreme Court has set forth a two-part analysis for resolving qualified immunity claims, which we may address in any order.  See Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  First, we must consider whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *overruled in part on other grounds by* Pearson, 555 U.S. at 236, 129 S. Ct. 808.  Second, we must determine whether the right was clearly established at the time of the alleged violation.  Saucier, 533 U.S. at 201, 121 S. Ct. 2151.  Even if the right was clearly established at the time of the violation, it may be "difficult for [the defendant] to determine how the relevant legal doctrine . . . will apply to the factual situation the [defendant] confronts." Id. at 205, 1[21] S. Ct. [2151].  Therefore, "[i]f the . . . mistake as to what the law requires is reasonable . . . the [defendant] is entitled to the immunity defense." Id.

Brown v. Or. Dep't of Corr., 751 F.3d 983, 989 (9th Cir. 2014) (alterations in Brown).

b.   Even if compelling Plaintiff to participate in the Module Program was a violation of the Establishment Clause, a prisoner's right not to be compelled to participate in a secular program that had a limited number of optional religious activities was not clearly established at the time of the

31

violation of Plaintiff's rights.  In contrast, in <u>Inouye</u>, the
Ninth Circuit held the parole officer was not entitled to
qualified immunity because relevant constitutional right was
clearly established.  504 F.3d at 715 ("By 2001, two circuit
courts, at least three district courts, and two state supreme
courts had all considered whether prisoners or parolees could be
forced to attend religion-based treatment programs.").

   c. Thus, Victorino would be entitled to qualified
immunity from Plaintiff's Establishment Clause claim in Count I.

  10. To the extent Count I alleges a violation of
Plaintiff's rights under the Free Exercise Clause, the claim
fails because Plaintiff did not present any evidence that his
practice of the Native Hawaiian Religion was prohibited or
impaired while he was participating in the Module Program.

  11. Victorino is entitled to judgment in his favor as to
Count I.[10]

## Count II – Retaliation

  12. Although the Complaint only cites the Fourteenth
Amendment as the basis for Count II, it is liberally construed as
alleging a First Amendment retaliation claim.  <u>See</u> <u>Brodheim v.</u>
<u>Cry</u>, 584 F.3d 1262, 1269-73 (9th Cir. 2009) (discussing First
Amendment retaliation claim for violation of prisoners' First
Amendment right to file prison grievances).

---

[10] Miyajima is not named as a defendant in Count I.

13.  The First Amendment states, in relevant part: "Congress shall make no law . . . abridging the freedom . . . to petition the Government for a redress of grievances."  As previously noted, the First Amendment is applicable to the states through the Fourteenth Amendment.

14.  In a First Amendment retaliation claim, the plaintiff is "entitled to prevail if: '(1) . . . a state actor took some adverse action against [him] (2) because of (3) [his] protected conduct, and that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'"  Entler v. Gregoire, 872 F.3d 1031, 1040 (9th Cir. 2017) (alterations in Entler) (quoting Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005)).[11]

15.  Placing Plaintiff in segregation and transferring him to Halawa – a higher security facility – each constitutes an adverse action against him.

16.  Presenting prison grievances, whether verbal or written, constitutes protected activity under the First Amendment.  Entler, 872 F.3d at 1039.

---

[11] Although Rhodes reviewed the Fed. R. Civ. P. 12(b)(6) dismissal of a First Amendment retaliation claim, the elements are the same when such a claim is decided on the merits.  See, e.g., Brodheim, 584 F.3d at 1269 n.3 (summary judgment).

17. However, Plaintiff's retaliation claim fails because he has not proven the adverse actions were taken against him because of his protected conduct.

18. Miyajima is entitled to judgment in his favor as to Count II.[12]

**Count III – Equal Protection**

19. Section 1 of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." This "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

20. The Ninth Circuit has stated:

> To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class. Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998). "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis in original) (citation omitted).

Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003).

21. Because the Module Program is not a religious program, and the denial of certain privileges and opportunities to non-Program inmates is not based on religion, Plaintiff has failed to establish that the intent or purpose of the Module Program is to

_____

[12] Victorino is not named as a defendant in Count II.

discriminate against Plaintiff – or any other non-Program inmate – based on religion.

22.   Plaintiff's Fourteenth Amendment Equal Protection claim fails, and Defendants are entitled to judgment as to Count III.

## DECISION AND ORDER

AND NOW, following the conclusion of a bench trial in this matter, and in accordance with the foregoing Findings of Fact and Conclusions of Law, it is HEREBY ORDERED that judgment shall enter in favor of Defendants as to all remaining counts in Plaintiff's Prisoner Civil Rights Complaint, filed December 28, 2015.

In addition, Plaintiff's Motion for Judgment in Plaintiff's Favor, filed August 4, 2017, is DENIED; Defendant's oral motion for judgment as a matter of law, made at the close of Plaintiff's case, is DENIED; and Defendant's Motion for Judgment on Partial Findings, filed August 15, 2017, is GRANTED.

The Clerk's Office is DIRECTED to enter judgment in favor of Defendants and to close the case immediately.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 9, 2018.



      /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**DUANE F. DAWSON VS. NEAL WAGATSUMA, ET AL; CIVIL 15-00537 LEK-KSC; FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION ON NON-JURY TRIAL HELD ON AUGUST 8, 2017; ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT IN PLAINTIFF'S FAVOR AND DENYING DEFENDANT'S ORAL MOTION FOR JUDGMENT AS A MATTER OF LAW; AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON PARTIAL FINDINGS**